219 N.J. Super. 263 (1987)
530 A.2d 324
LOWER MAIN STREET ASSOCIATES, A NEW JERSEY LIMITED PARTNERSHIP AND A LIMITED DIVIDEND HOUSING ASSOCIATION; AND UNION PLAZA ASSOCIATES, A NEW JERSEY LIMITED PARTNERSHIP AND LIMITED DIVIDEND HOUSING ASSOCIATION, PLAINTIFFS-APPELLANTS,
v.
NEW JERSEY HOUSING AND MORTGAGE FINANCE AGENCY, STATE OF NEW JERSEY, DEFENDANT-RESPONDENT.
Superior Court of New Jersey, Appellate Division.
Argued May 6, 1987.
Decided July 8, 1987.
*266 Before Judges KING,[1] HAVEY and MUIR, Jr.
Frederic K. Becker argued the cause for appellants (Wilentz, Goldman & Spitzer, attorneys; (Gordon J. Golum and Frederic K. Becker of counsel and on the briefs).
Richard L. Evert, Deputy Attorney General, argued the cause for respondent (W. Cary Edwards, Attorney General of New Jersey, attorney; Michael R. Clancy, Deputy Attorney General, of counsel; Richard L. Evert on the brief).
The opinion of the court was delivered by HAVEY, J.A.D.
Plaintiffs, Lower Main Street Associates (LMSA) and Union Plaza Associates (UPA), are the owners of moderate-income apartment projects financed by mortgage loans held by respondent New Jersey Housing and Mortgage Finance Agency (HMFA). At issue on appeal is the validity of regulations adopted in 1985 governing the prepayment of HMFA mortgages and the charging of fees upon the sale of HMFA-financed projects. Specifically, the regulations prohibit prepayment of the HMFA mortgage without the agency's approval, limit return on investment upon sale of a project involving the prepayment of the HMFA mortgage to 8 per cent, and charge various closing fees upon the sale of an agency-financed project. Plaintiffs contend the regulations: (1) contravene the mortgage documents; (2) are not authorized by statute; (3) violate the contract clauses of the federal and state constitutions, and (4) constitute a taking of property without due process. We conclude that the prepayment regulations do not violate the terms of the HMFA mortgages, are statutorily authorized, and do not violate plaintiffs' constitutional rights. We hold, however, that *267 the regulation imposing closing fees is unreasonable and not authorized by statute and therefore invalid.
HMFA was created under the New Jersey Housing and Mortgage Finance Agency Law of 1983, L. 1983, c. 530, codified N.J.S.A. 55:14K-1, et seq. HMFA is a consolidation of the prior New Jersey Housing Finance Agency (HFA) and the New Jersey Mortgage Finance Agency. N.J.S.A. 55:14K-4. Prior to the merger, the HFA financed the construction or rehabilitation of moderate-income housing by the issuance of finance bonds. N.J.S.A. 55:14J-1, et seq., (repealed by N.J.S.A. 55:14K-1, et seq.). The 1967 act creating the HFA recognized a need for "... adequate, safe and sanitary dwelling units for many families of moderate income in this State ..." and that cooperation between private enterprise and the state was essential to meet this need. N.J.S.A. 55:14J-2 (now repealed). The 1983 act creating the HMFA continued this purpose, adding as a goal the desire to provide low as well as moderate-income housing. N.J.S.A. 55:14K-2e(2). HMFA assumed the obligations of the HFA bonds under N.J.S.A. 55:14K-4d and was granted its own tax-exempt bonding authority. See N.J.S.A. 55:14K-20.
Both LMSA and UPA are limited partnerships organized as limited-dividend housing associations under N.J.S.A. 55:16-1, et seq. UPA was created in June 1969; LMSA in May 1970. HFA granted construction loans to both UPA and LMSA for the construction of moderate-income housing. In 1969 UPA borrowed $5,835,000 to construct 240 units in Union City. In 1971, LMSA borrowed $7,665,000 to construct 288 units in Rahway. Both loans were for 90 per cent of the project cost, had 50-year terms and interest rates fixed by the interest payable by HFA on finance bonds to be issued by it for the purpose of obtaining funds necessary to make the mortgage *268 loans.[2] HFA used the proceeds of bond-anticipation notes to advance the construction financing to UPA and LMSA.
Upon execution of the construction mortgages, each appellant executed regulatory agreements under which they agreed to HFA control over the fixing of rents to be charged and management of the projects. They also agreed that the projects would be open only to families of moderate income as determined by the HFA. Both regulatory agreements provided that distributions to the partners on their equity investment would be limited to 8 percent per annum.
In April 1972, LMSA and UPA executed conforming mortgages to HFA. Paragraph 6 of both mortgages contained the following clause as to prepayment:
[T]he Mortgagor shall not make any advance principal payment prior to the date on which all of the Bonds issued by the Mortgagee for the purpose of obtaining funds with which to make this Mortgage Loan are redeemable. With respect to any advance principal payment so permitted thereafter, the Mortgagor shall pay an amount equal to the aggregate of (i) the principal amount of the Mortgagor's Mortgage Loan Obligations ... remaining unpaid, (ii) the Mortgagor's Housing Finance Fund Obligations ... remaining unpaid, (iii) the interest to accrue on all Bonds of the Mortgagee to be redeemed ... to the next call date thereof not previously paid by Mortgagor, (iv) the call premium, if any, on the Bonds so to be redeemed, and (v) the cost and expenses of the Mortgagee in effecting the redemption....
By resolution adopted May 16, 1972, HFA authorized the issuance of the 1972 Series A General Housing Loan Bonds in the amount of $58,915,000. The bond resolution provided that Series A bonds "maturing on and after November 1, 1983" would be subject to redemption on or after November 1, 1982 at the option of HFA. The resolution prohibited prepayment of the mortgages until the bonds were redeemable. Both UPA and LMSA were recipients of the bond-sale proceeds.
Effective May 20, 1985, HMFA adopted the regulations which are the subject of the present dispute. The three challenged *269 regulations are part of an overall regulatory scheme adopted by the agency controlling the transfer of ownership rights to agency-financed projects.
The first regulation in dispute is N.J.A.C. 5:80-5.10, which prohibits prepayment of HMFA mortgages without written agency approval. The second challenged regulation, N.J.A.C. 5:80-5.8(b), provides that a prepaying mortgagor is limited to a cumulative return on its investment of 8 percent per annum. N.J.A.C. 5:80-5.8(b). Upon the sale of a prepaying mortgagor's project, "... any amounts realized by the seller in excess of 8 percent shall be paid to the Agency as an additional fee for approving the transfer." N.J.A.C. 5:80-5.8(b)1. If a project is sold without prepayment of the mortgage, the limit applies only to revenues received from operations; no limit on return of equity applies to money earned from the sale of a project. N.J.A.C. 5:80-5.8(b)2. The third regulation challenged, N.J.A.C. 5:80-5.9(a) provides that at the closing of any sale, whether the mortgage is prepaid or not, a "processing fee" of one-half of one percent of the purchase price is to be paid to HMFA. N.J.A.C. 5:80-5.9(a)1. A seller must prepay $5,000 which is applied toward the "processing fee" at closing. N.J.A.C. 5:80-5.9(a)2. Further, sellers of projects with direct federal subsidies are required to pay 10 percent of the cash proceeds of sale into the agency's "portfolio reserve" account; the fee is 15 percent of the proceeds when there is no federal subsidy. N.J.A.C. 5:80-5.9(a)3.
Plaintiffs have appealed directly to the Appellate Division challenging the regulations. See R. 2:2-3(a)(2). They seek a declaration that the regulations are invalid and an order permanently enjoining their enforcement.

I
Plaintiffs contend that N.J.A.C. 5:80-5.10 which prohibits prepayment without agency approval abrogates their right to prepay the mortgage loans as contained in paragraph six of *270 the conforming mortgages. The first sentence of the paragraph prohibits prepayment prior to the date the finance bonds are "redeemable". Plaintiffs point to the second sentence of the paragraph which reads:
With respect to any advanced principal payment so permitted thereafter, the Mortgagor shall pay an amount equal to.... [Emphasis supplied].
Plaintiffs argue that reference to principal payments "so permitted thereafter" is referable to the antecedent sentence which inferentially permits prepayment once the funding bonds are redeemable. HMFA claims that the language "so permitted thereafter" was intended to permit prepayment only as permitted thereafter by the agency.
It is undisputed that plaintiffs have no common law or statutory right to prepay the mortgage loans. See Weinstein v. Investors Savings and Loan Assn., 154 N.J. Super. 164, 167 (App.Div. 1977), certif. den. 75 N.J. 598 (1978); Bloomfield Sav. Bank v. Howard S. Stainton and Co., 60 N.J. Super. 524, 531-532 (App.Div. 1960); see also N.J.S.A. 46:10B-1 and 46:10B-2 (right to prepay mortgage at any time limited to loans on a structure containing six units or less and owned by any person "other than a corporation"). Thus plaintiffs' right to prepay must be found in the mortgage documents themselves. See Bloomfield Sav. Bank v. Howard S. Stainton and Co., supra, 60 N.J. Super. at 531-532.
The polestar of contract construction is to discover the intentions of the parties. Kearny PBA Local #21 v. Town of Kearny, 81 N.J. 208, 221 (1979). In the quest for intention, not only shall the entire contract be considered, but also the particular setting in which the contract was executed, the relations of the parties, the attendant circumstances and the objects the parties were thereby striving to obtain. Onderdonk v. Presbyterian Homes of N.J., 85 N.J. 171, 183-184 (1981); Atlantic Northern Airlines, Inc., v. Schwimmer, 12 N.J. 293, 301 (1953). An agreement must be considered in the context of the circumstances under which it was entered into, and it must be accorded a rational meaning in keeping with the express general *271 purpose. Tessmar v. Grosner, 23 N.J. 193, 201 (1957); Anthony L. Petters Diner, Inc. v. Stellakis, 202 N.J. Super. 11, 28 (App.Div. 1985).
With these interpretative principles in mind, we conclude that the phrase "so permitted thereafter" in the conforming mortgages was intended to permit prepayment after redeemability of the finance bonds only as permitted by the mortgagee, HMFA. What is clear from the mortgages and regulatory agreements signed by plaintiffs is that the agency was lending funds to carry out a public purpose: to provide financing to private industry for the construction of affordable middle-income rental housing. Plaintiffs accepted the mortgage proceeds for that purpose and enjoy the benefits of low interest rates and a mortgage term of 50 years. In turn, plaintiffs agreed to regulatory control of the units by the agency. All parties recognize that the agency's control over selection of prospective tenants, rental charges and project management is co-extensive with the life of the mortgages, since the regulatory contracts by their very terms expire upon satisfaction of the mortgages.
Considering the purpose of the project loans and the attendant benefits enjoyed by plaintiffs, the prepayment clause must be interpreted as intending to repose in the agency unfettered control over when and how the mortgages can be satisfied after the bonds become redeemable. Otherwise, mortgagors could reap the benefits of the HMFA mortgage terms and thereafter prepay at will once the finance bonds become redeemable, thereby escaping regulatory control. To allow prepayment would invite flight from the low and middle-income market, thus frustrating the very purpose of the HMFA statutory scheme. Plaintiffs alone would have the capacity of removing from the affordable housing market 528 units upon prepayment of the mortgages. We cannot conceive that the parties intended to foster building and maintain affordable housing only for the period the finance bonds remain unredeemable. Rather, it is in keeping with the legislative goals to conclude that the *272 parties intended to provide affordable housing for the life of the mortgages. We are therefore satisfied that the language "so permitted thereafter" was intended to maintain HMFA control over prepayment after redeemability of the finance bonds. N.J.A.C. 5:80-5.10 is nothing more than a regulatory expression of HMFA's contractual right to govern prepayment, and thus does not conflict with the terms of the conforming mortgages.
The next question is whether N.J.A.C. 5:80-5.10 is statutorily authorized. N.J.S.A. 55:14K-1, et seq., which creates the HMFA does not expressly provide for the agency's regulatory control over prepayment. An administrative regulation "... must be within the fair contemplation of the delegation of the enabling statute." New Jersey Guild of Hearing Aid Dispensers v. Long, 75 N.J. 544, 561-562 (1978), quoting Southern Jersey Airways v. Nat. Bk. of Secaucus, 108 N.J. Super. 369, 383 (App.Div. 1970). However, the grant of authority to an agency "... is to be liberally construed in order to enable the agency to accomplish its statutory responsibilities and ... courts should readily imply such incidental powers as are necessary to effectuate fully the legislative intent." New Jersey Guild of Hearing Aid Dispensers v. Long, supra, 75 N.J. at 562; In the Matter of N.J.A.C. 14A:20-1.1, et seq., 216 N.J. Super. 297, 305 (App.Div. 1987).
A liberal construction of authority is particularly appropriate when the agency's concern is the protection of the health and welfare of the public. K.P. v. Albanese, 204 N.J. Super. 166, 176 (App.Div.), certif. den. 102 N.J. 355 (1985). A presumption of validity and reasonableness must be accorded to the agency action and the burden is on the challenger to overcome such presumption. Bergen Pines Hosp. v. Dept. of Human Serv., 96 N.J. 456, 477 (1984). The scope of review is whether the administrative policy is arbitrary, capricious or unreasonable or beyond the ambit of the agency's delegated powers. New *273 Jersey Guild of Hearing Aid Dispensers v. Long, supra, 75 N.J. at 561.
So viewed, we are satisfied that HMFA acted well within its statutory authority in adopting the prepayment regulation. As earlier stated, HMFA's purpose is to stimulate the construction by the private sector of low and moderate-income housing. N.J.S.A. 55:14K-2e. It is empowered "[t]o do any acts and things necessary or convenient to carry out the powers expressly granted in this act." N.J.S.A. 55:14K-5ff. It may adopt rules and regulations "... necessary or desirable to carry out ..." its statutory purpose. N.J.S.A. 55:14K-5g.
Regulating prepayment of HMFA loans is consistent with the legislative goals of increasing the number of adequate affordable housing units and enhancing the private sector's capacity to construct such housing. As noted earlier, without HMFA control over prepayment, projects could be removed from the affordable housing market at the mortgagor's whim. The regulations prohibiting prepayment are necessary for the agency to carry out its statutory duty and were validly adopted under HMFA's implied and incidental powers.

II
Plaintiffs next challenge N.J.A.C. 5:80-5.8 which limits a prepaying mortgagor upon sale of a project or any interest therein to a cumulative return on its investment of 8 percent per annum. The regulation reads in applicable part:
(b) In conjunction with permitted prepayments of the Agency's mortgage, the mortgagor shall be limited to a cumulative return on its investment of 8 percent per annum. This limit shall include any return from project operations or on sale of the project.
1. Upon sale or other disposition of the project or any interest thereon, any amounts realized by the seller in excess of 8 percent shall be paid to the Agency as an additional fee for approving the transfer.
Plaintiffs argue that the regulation unlawfully imposes a "forfeiture" to the agency of all capital gains on the sale of a project resulting from an increase in fair market value of the project. They argue that the pertinent statutes do not contemplate *274 that the limitation on return on investments should apply to capital gains arising from the project sale. Plaintiffs point to the Limited-Dividend Nonprofit Housing Corporations or Associations Law, N.J.S.A. 55:16-1, et seq., (under which both were organized), the HFA Law, and the HMFA Law, and argue that the 8 percent limitation contained in each statute was intended to apply only to annual or accumulated return on investment, and not to capital gains realized from the increase in fair market value of the projects. See e.g. N.J.S.A. 55:16-5; 55:16-9.1; 55:14J-9(a)(6) (now repealed), and 55:14K-7a(6).
Even if plaintiffs are right in their interpretation of the pertinent statutes, absence of an express provision in the statutes limiting capital gains realized from the sale of HMFA-mortgaged projects is no impediment to the agency's power to adopt such a limitation as consideration for prepayment of the mortgage. As we have earlier observed, plaintiffs have no common law or statutory right to prepayment, and the contract documents permit HMFA to control when and if prepayment shall be allowed. Moreover, the stated legislative policy to assure affordable housing authorizes regulations controlling the manner by which prepayment will be allowed, if at all. Agency action is not precluded if it promotes or advances policies and findings that serve as the driving force for the legislation. D.S. v. East Brunswick Tp. Bd. of Ed., 188 N.J. Super. 592, 598 (App.Div.), certif. den. 94 N.J. 529 (1983). A procedurally correct regulation may be set aside only if it is arbitrary or capricious or "... plainly transgresses the statute it purports to effectuate, [citation omitted], or if it alters the terms of the statute or frustrates the policy embodied in it." Matter of Repeal of N.J.A.C. 6:28, 204 N.J. Super. 158, 161 (App.Div. 1985).
The limit on cumulative return on investment of 8 percent per annum serves a statutory purpose. The regulation accommodates both the agency's desire to attract private capital by permitting recovery of cumulative return on investment, and its need to maintain regulatory power over the projects. Payment *275 to the agency of any capital gain in excess of the 8 percent return on investment is a means of creating a financial disincentive to prepay the mortgage. This is clear since under N.J.A.C. 5:80-5.8(b)2, a project may be sold without a limit on capital gains if the buyer assumes the HMFA mortgage.
This "disincentive" is entirely consistent with the agency's legislative purpose of maintaining affordable low and middle-income housing since it discourages prepayment and thus maintains HMFA's regulatory control over the projects. In view of the agency's purpose and the general judicial and statutory recognition of the need for low and moderate-income housing, we conclude that the "financial disincentive" of the 8 percent cap on capital gains is both statutorily authorized and reasonable. See So. Burlington Cty. N.A.A.C.P. v. Mount Laurel Tp., 92 N.J. 158 (1983) (Mount Laurel II); So. Burl. Cty. N.A.A.C.P. v. Tp. of Mt. Laurel, 67 N.J. 151 (1975) (Mount Laurel I), appeal dis. 423 U.S. 808, 96 S.Ct. 18, 46 L.Ed.2d 28 (1975); see also The Fair Housing Act, L. 1985, c. 222, codified N.J.S.A. 52:27D-301, et seq.

III
We also reject plaintiffs' impairment of contract and unlawful taking contentions. Both the federal and State constitutions prohibit the impairment of contracts. U.S. Const., Art. I, § 10 cl. 1; N.J. Const. (1947), Art. IV, § VII, par. 3. The threshold inquiry in a challenge to a state law based on the contract clause is whether the law operates "... as a substantial impairment of a contractual relationship." Energy Reserves v. Kansas Power & Light, 459 U.S. 400, 411, 103 S.Ct. 697, 704, 74 L.Ed.2d 569 (1983); see also Edgewater Inv. Associates v. Borough of Edgewater, 201 N.J. Super. 267, 278 (App.Div. 1985), aff'd, 103 N.J. 227 (1986). If so, the State must establish "... a significant and legitimate public purpose ..." underlying the challenged statute. Energy Reserves v. Kansas Power & Light, supra, 459 U.S. at 411, 103 S.Ct. at 704. Once *276 the legislative public purpose is identified, the inquiry is whether the adjustment of the rights of the respective parties is based on reasonable conditions and is sufficiently related to an appropriate governmental interest. Id. at 412, 103 S.Ct. at 705.
Here, plaintiffs failed to satisfy the threshold tier of the inquiry. Because they never had a common law, statutory, or contractual right to prepay the mortgages, it cannot be said that the regulations operated "... as a substantial impairment of a contractual relationship." Id. at 411, 103 S.Ct. at 704.
For the same reasons, we reject the contention that the regulations constitute a taking of plaintiffs' property without due compensation in violation of the due process clause of the Fourteenth Amendment to the federal constitution. To invoke the protections of the due process clause, a litigant must first establish that the individual interest asserted is encompassed in its terms. Board of Regents v. Roth, 408 U.S. 564, 577, 92 S.Ct. 2701, 2709, 33 L.Ed.2d 548 (1972). The Fifth Amendment protects property interests created and defined by independent sources such as statutes, legal rules or mutually explicit interests; it does not create property interests of its own force. See Leis v. Flynt, 439 U.S. 438, 441, 99 S.Ct. 698, 700, 58 L.Ed. 717 (1979), reh'g den. 441 U.S. 956, 99 S.Ct. 2185, 60 L.Ed.2d 1060 (1979). A "property interest" may take many forms over and above the ownership of tangible property, but the key concept is "entitlement". Nicoletta v. No. Jersey District Water Supply Commission, 77 N.J. 145, 154-155 (1978). Since plaintiffs have no "property interest" in or "entitlement" to prepayment of the mortgages, their constitutional protection against deprivation of property without due process is not implicated.

IV
Finally, plaintiffs challenge N.J.A.C. 5:80-5.9 which imposes fees upon the closing of a sale of a project, whether the mortgage is prepaid or not. The regulation charges the following fees upon closing: (a) a "processing fee" equal to one-half *277 of one percent of the purchase price; (b) a non-refundable fee of $5,000 which is applied toward the "processing fee" at closing, and (c) a fee equal to 10 percent of the cash proceeds of a sale of a project with direct federal subsidies, and 15 percent of a sale of a project without federal subsidies. HMFA relies on the presumption of validity accorded the regulation, and argues that plaintiffs have presented no evidence to rebut the presumption.
We agree with plaintiffs that the fees established by N.J.A.C. 5:80-5.9 are unreasonable and unauthorized by statute. Firstly, as we understand the regulation, the fees are charged upon the sale of a project whether the HMFA mortgage is prepaid or not. Thus, the rationale supporting the prepayment regulations, to allow continued control over the project, is inapplicable. It therefore cannot be said that the agency's incidental or implied statutory powers support imposition of the fees.
Secondly, HMFA is permitted "[t]o make and collect the fees and charges it determines are reasonable[.]" N.J.S.A. 55:14K-5p [emphasis supplied]. At oral argument, the deputy attorney general stated that the fees were, at least in part, for the purpose of funding the agency to meet its operating costs. However, the Legislature provided a specific means of raising revenue to defray the administrative cost of HMFA. N.J.S.A. 55:14K-20a authorizes the agency to issue bonds necessary to provide sufficient funds for achieving its corporate purpose, including the making of loans and the payment of "... all other costs or expenses of the agency incident to and necessary ... to carry out its corporate purposes and powers...." Thus, the agency's bonding power is the means by which it is to meet general operating costs.
The Legislature, of course, may delegate to an agency the authority to impose fees to defray the cost of review of applications and of regulation and control, providing the delegation is with sufficient guidelines and standards. Atlantic City Casino Hotel v. Casino Control Com'n, 203 N.J. Super. 230, 236-237 *278 (App.Div.), certif. den. 102 N.J. 326 (1985). Moreover, the fees charged must be reasonably related to and not exceed the approximate cost of processing and administering the activity being controlled by the agency. Id. at 235-236. The fees cannot be employed as a device to raise general revenue. Ibid.
We conclude that the closing fees are patently excessive and thus invalid, notwithstanding the accorded presumption of validity. There is not even the slightest suggestion that the fees are reasonably related to the costs of monitoring the sale of a financed project. As we understand the regulation, a $10,000,000 cash sale without federal subsidy would require payment of fees to HMFA of 1.5 million dollars (15 percent of the cash purchase price) and $50,000 (one-half of one percent of the purchase price). This aggregate fee is exorbitant and clearly has no rational relationship to the agency cost of administering the sale of an agency financed project.
We accordingly remand to the agency for appropriate action in determining closing fees based on the reasonable estimated costs of processing and monitoring the transfer of project ownership. Otherwise, we affirm. We do not retain jurisdiction.
NOTES
[1] Judge King did not participate in oral argument but, with consent of counsel, participated in the case.
[2] The interest on the bonds ultimately sold ranged from as high as 8 per cent in 1973 to 4.70 per cent in 1984.