## SBA NETWORK SERVICES, INC.

v.

## TELECOM PROCUREMENT SERVICES, INC.; TNT Communications; Gerald Kershner; Rick Rollert

---

**Telecom Procurement Services, Inc., Appellant.**

No. 06–4162.

United States Court of Appeals, Third Circuit.

Submitted Under Third Circuit LAR 34.1(a) Sept. 25, 2007.

Filed: Oct. 9, 2007.

Jeffrey M. Olszewski, Cipriani & Werner, Pittsburgh, PA, for SBA Network Services, Inc.

Paul R. Robinson, Meyer, Darragh, Buckler, Bebenek & Eck, Pittsburgh, PA, for Telecom Procurement Services, Inc.

Before: McKEE, BARRY, and FISHER, Circuit Judges.

## OPINION

BARRY, Circuit Judge.

Appellant Telecom Procurement Services, Inc. ("TPS") appeals from orders of the District Court granting summary judgment in favor of Appellee SBA Network Services, Inc. ("SBA") and awarding $355,334.71 in damages, interest, fees, and costs. TPS also contends that the District Court erred in dismissing its crossclaims. For the reasons discussed below, we will affirm in part, reverse in part, and remand for further proceedings consistent with this opinion.

## I.

This action arises out of a fire that occurred on October 9, 2003 in a wireless telecommunications tower (the "Tower") owned by Sprint Communications and located in Catskill, New York. Cingular Wireless, seeking to add its phone service to the Tower, contracted with Bechtel Corporation ("Bechtel") for the installation of communications equipment. Bechtel, in turn, subcontracted the work to SBA, a Florida corporation.

In need of a certified welder, SBA contacted TPS, a New York corporation that was performing work on nearby telecommunications towers. Pursuant to this inquiry, TPS, on September 29, 2003, submitted a "pricing proposal" to SBA for the installation of three hand holes and an entry port on the Tower. SBA accepted the proposal on October 1, 2003. The next day, SBA and TPS representatives executed a Purchase Order Subcontract (the "Subcontract") for TPS's installation of the three hand holes and the entry port. Just above the signature of TPS's authorized representative, the Subcontract expressly incorporated four exhibits, which included, among other things, the pricing proposal and acceptance, as well as "General Conditions" and "Minimum Safety Requirements."

On October 4, 2003, TPS issued a purchase order to Appellee TNT Communications ("TNT"), an Iowa business entity, for the very work that TPS had contracted with SBA to perform. Although the purchase order originated with TPS and appeared under its letterhead, TPS contends that it provided no instruction or assistance to TNT, and that SBA made all necessary arrangements. Nonetheless, TPS charged a 15 percent markup for its service.

On October 9, 2003, between 9 and 10:00 A.M., TPS foreman Terry Pennell dis-

patched a TNT work crew, consisting of Gerald Kershner and Rick Rollert, to the Tower. There, Kershner and Rollert met with Joseph Rains, the SBA site superintendent. No TPS representative was present, although TPS's president testified that Pennell held ultimate responsibility for the job, including the responsibility to ensure that all work was performed by qualified workers and in accordance with TPS and Bechtel standards. Rains gave the TNT employees access to the Tower, provided the ports to be installed, and remained onsite for several hours while Kershner and Rollert performed the work.

While Kershner and Rollert were welding, a fire started inside the Tower. Heat from the fire caused the Tower to buckle, rendering it unusable. SBA subsequently had the Tower disassembled and replaced with a new structure. The total cost to SBA for replacing the Tower was $268,408.13.

On October 4, 2005, SBA filed a complaint in the U.S. District Court for the Western District of Pennsylvania, naming as defendants TPS, TNT, Kershner, and Rollert. Count 1 alleged that TPS had breached the Subcontract by, among other things, failing to indemnify SBA for more than $237,000 in damages incurred as a result of the fire. Counts 2 through 5 alleged negligence on the part of TPS, TNT, Kershner, and Rollert, respectively. TPS answered and filed crossclaims against TNT, Kershner, and Rollert for indemnification and contribution, although Rollert was never successfully served. At no point did TNT, Kershner, or Rollert answer or otherwise defend SBA's claims or TPS's crossclaims.

After the completion of discovery, SBA and TPS filed cross-motions for summary judgment. On July 20, 2006, the District Court granted summary judgment for SBA as to the breach of contract claim, granted summary judgment for defendants as to the negligence claims, and reserved decision on the question of damages. TPS moved, pursuant to Federal Rule of Civil Procedure 59(e), to alter or amend the judgment, and SBA simultaneously filed a second motion for summary judgment on the question of damages. On August 23, 2006, the Court denied TPS's Rule 59(e) motion. After hearing argument, the Court, on August 31, 2006, 2006 WL 2561236, granted SBA's second motion for summary judgment and ordered the entry of judgment against all defendants in the amount of $355,334.71, including damages of $268,408.13, prejudgment interest of $51,668.55, and attorneys' fees and costs in the amount of $35,258.03. TPS never raised its crossclaims at any point during the summary judgment proceedings, and none of the Court's memoranda or orders specifically addressed them. This appeal followed.

## II.

The District Court had diversity jurisdiction under 28 U.S.C. § 1332. We have jurisdiction to review the final decision of the District Court under 28 U.S.C. § 1291. We apply the same standard as the District Court. In conducting our plenary review of the record, we view all evidence and draw all reasonable inferences in a light most favorable to the nonmoving party. *Matreale v. N.J. Dep't of Military & Veterans Affairs*, 487 F.3d 150, 152 (3d Cir.2007). Summary judgment is appropriate only if "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c).[1]

---

**1.** The District Court determined that Florida law governed the interpretation of the con-

tract. Because TPS does not raise choice of

■ TPS contends that its contract with SBA consists of TPS's September 29, 2003 price proposal, SBA's October 1, 2003 acceptance, and an undated one-page exhibit on TPS letterhead describing the general nature of the work to be performed. In support of this position, TPS notes that when SBA returned the signed price proposal, its facsimile cover sheet stated, "Here is the signed contract. Please accept [t]his as your notice to proceed." (App. at 197.) TPS would have us ignore, therefore, the Subcontract that the parties executed on October 2, 2003.

We easily conclude, as did the District Court, that TPS is bound by the October 2, 2003 Subcontract and the exhibits expressly incorporated therein. On its face, TPS's September 29 proposal related only to "pricing," and SBA's October 1 acceptance served only to fix the price term of the parties' agreement. The next day, SBA proposed the remaining terms and conditions, which TPS promptly accepted. No additional consideration was needed because the Subcontract merely complemented, and did not modify, the parties' earlier price agreement. (*See* App. at 62 ("The Contract Documents are intended to be correlative and complementary. . . . ").) *See Newkirk Constr. Corp. v. Gulf County,* 366 So.2d 813, 815 (Fla.Dist.Ct.App.1979) ("*Modifications* of contracts must be supported by new consideration as well as the consent of both parties." (emphasis added)); *see also Whitley v. Royal Trails Prop. Owners' Ass'n,* 910 So.2d 381, 383 (Fla.Dist.Ct.App.2005) ("When two or more documents are executed by the same parties at or near the same time, in the course of the same transaction, and concern the same subject matter, they will be read and construed together.").

We likewise reject TPS's related argument that it should not be bound by the

law as an issue on appeal, we will assume the

General Conditions because it did not receive them until after the fire. The only evidence on this point one way or the other was the testimony of Todd D'Angelo, SBA's field operations manager. D'Angelo testified that under SBA's normal procedures, TPS would have received the General Conditions when it first performed work for SBA in December 2002, and that those provisions would need to be on file at SBA's home office before subsequent purchase orders could be awarded to TPS. (*See* App. at 352–53; *see also id.* at 197 (issuing purchase orders to TPS on October 1, 2003); 243–44 (testifying that TPS first worked for SBA in December 2002); 464–65 (attesting that SBA and TPS entered into a Purchase Order Subcontract Agreement for a prior job in February 2003).) By comparison, when TPS's president was asked whether TPS had received a vendor's package from SBA in the months prior to the fire, he responded only that he "d[id] not know" and "would have to check." (*Id.* at 248.)

■ Section 29.0 of the General Conditions provides that a subcontractor—in this case, TPS—shall be responsible for property damage arising out of its performance of the contracted-for work:

> Subcontractor shall protect, hold free and harmless, defend and indemnify Contractor and Owner (including its agents and employees) for all liability, penalties, costs, losses, damages, expenses, causes of action, claims or judgments (including attorneys' fees) resulting from . . . damage to property of any kind, which . . . damage arises out of or is in any way connected with the performance of work under this Contract.

(App. at 66.) That same section provides an exception where the damage arises

application of Florida law.

from the sole negligence or willful misconduct of a non-party independent contractor who is "directly responsible to Contractor or Owner." (*Id.*) TPS argues that this exception applies because TNT was "directly responsible" to SBA, not TPS. This argument is without merit. The purchase order for TNT's services originated with TPS, not SBA, and TNT was paid by TPS. It was also a TPS foreman who dispatched the TNT crew to the Tower and "communicated to start ... cutting entry ports into [the Tower]." (App. at 234.) That an SBA representative provided access to the site and was "sitting in [his] truck" nearby while the TNT crew worked on the Tower certainly did not strip TPS of its "ultimate[ ] responsibility for the job." (App. at 253–54, 300; *see also id.* at 252 (admitting that TPS employees were responsible for implementing the TNT purchase order).)

TPS argues, next, that the indemnity clause at Section 29.0 did not permit SBA to recover attorneys' fees and costs as a result of prosecuting this action. We disagree. Nothing in the provision limits SBA's recovery of attorneys' fees to defending—as opposed to prosecuting—legal claims. Rather, section 29.0 unambiguously provides that TPS shall indemnify SBA for "costs, losses, damages, expenses, causes of action, claims or judgments (including attorneys fees)." (App. at 66.) Even construing the indemnity provision strictly in favor of TPS, *see U.S.B. Acquisition Co. v. Stamm*, 660 So.2d 1075, 1079 (Fla.Dist.Ct.App.1995), we find no support whatsoever for TPS's reading of "attorneys' fees" as applying only to judgments

obtained against SBA by third parties. Nor do we find any basis under Florida law for setting aside an express attorneys' fee provision in a duly executed, arms-length commercial contract. The cases on which TPS relies are inapposite, as they address only attorneys' fees incurred in establishing the right to common-law indemnity, not contractual indemnity. *See, e.g., Bravo Elec. Co., Inc. v. Carter Elec. Co.*, 532 So.2d 698, 701 n. 3 (Fla.Dist.Ct. App.1988) (Cowat, J., dissenting); *cf. Kuhns v. Koob*, 408 So.2d 796, 797 (Fla. Dist.Ct.App.1982) (holding that indemnitee may recover attorneys' fees incurred in defending indemnity agreement); *Am. & Foreign Ins. Co. v. Avis Rent–A–Car Sys., Inc.*, 401 So.2d 855, 858 (Fla.Dist.Ct.App. 1981) ("[A]ttorney's fees incurred by a party may be awarded against the opposing party only when authorized by statute or by contract.").

TPS also contends that the District Court's calculation of prejudgment interest was contrary to Florida law.[2] Under Florida law, two prerequisites must be satisfied for a trial court to award prejudgment interest: "(1) out-of-pocket pecuniary loss; and (2) a fixed date of that loss." *Glover Distrib. Co. v. F.T.D.K., Inc.*, 816 So.2d 1207, 1213 (Fla.Dist.Ct.App.2002). When both prerequisites are satisfied, the award of prejudgment interest is mandatory. *Argonaut Ins. Co. v. May Plumbing Co.*, 474 So.2d 212, 215 (Fla.1985). Although SBA's out-of-pocket loss is unquestioned, TPS disputes the date that the District Court determined for that loss.

**2.** We have held that a court sitting in diversity awards prejudgment interest pursuant to the law of the forum. *Zippertubing Co. v. Teleflex Inc.*, 757 F.2d 1401, 1414 (3d Cir.1985). As neither party has urged the application of Pennsylvania's law to the award of prejudgment interest, however, we deem the parties to have consented to the application of Florida's law on this issue. *See Schwan's Sales Enters., Inc. v. SIG Pack, Inc.*, 476 F.3d 594, 596 (8th Cir.2007) (stating that a substantive matter of state law under the *Erie* Doctrine requires only that *some* state's law be applied to the issue).

■ The District Court found that SBA incurred full damages as of January 1, 2004, a date by which, according to SBA, the replacement tower was in place and operating. As TPS correctly notes, however, the record shows that as of that date, SBA had incurred an *out-of-pocket* loss of less than $1000. Although SBA is correct that under Florida law, damages for breach of contract generally are measured as of the date of the breach, *Grossman Holdings Ltd. v. Hourihan*, 414 So.2d 1037, 1040 (Fla.1982), the District Court determined that TPS's breach was not its negligence on October 9, 2003, but its subsequent failure to indemnify SBA for losses actually incurred. Thus, to order TPS to pay interest on monies that SBA had not yet expended is to award SBA a windfall.[3] *Metro. Dade County v. Bouterse, Perez & Fabregas Architects Planners, Inc.*, 463 So.2d 526, 527 (Fla.Dist.Ct.App. 1985) ("Awarding prejudgment interest from a time prior to the date any payment became due provides [the nonbreaching party] with a windfall and unjustly penalizes the [breaching party]."); *see also Nat'l Educ. Ctrs., Inc. v. Kirkland*, 678 So.2d 1304, 1306 (Fla.Dist.Ct.App.1996) (quoting same); *Koplowitz v. Girard*, 658 So.2d 1183, 1184 (Fla.Dist.Ct.App.1995) (stating that a party in a breach of contract action "can neither receive more than it bargained for nor should it be put in a better position than it would have been in had the contract been properly performed"). Because SBA has not demonstrated that it sustained an out-of-pocket loss of $268,408.13 as of January 1, 2004, we conclude that the District Court's award of prejudgment interest was erroneous.[4]

■ We have carefully reviewed SBA's evidence of damages and find it sufficient to support the District Court's judgment. We conclude, however, that the Court erred in ordering the docket closed without addressing TPS's crossclaims. Although, as SBA notes, TPS did not raise its crossclaims for indemnification and contribution at summary judgment, we see no need for it to have done so before it was adjudged liable to SBA. Because it is by no means clear that TPS cannot possibly prevail on its crossclaims (although we have little confidence that it will attempt to do so now), their dismissal without notice was inappropriate. *See PNH Corp. v. Hull-quist Corp.*, 843 F.2d 586, 594–95 (1st Cir. 1988) (vacating District Court's *sua sponte* dismissal of crossclaim for indemnification).

### III.

For the foregoing reasons, we will affirm the District Court's grant of summary judgment in favor of SBA on its breach of

3. We note, in particular, that SBA's records do not reflect any fixed date for its out-of-pocket loss corresponding to the more than $61,000 in additional damages that it appended to its second motion for summary judgment.

4. We reject, however, TPS's argument that prejudgment interest may not be awarded from a date earlier than SBA's formal demand for payment. Although there is some authority for this proposition, we note that the overriding purpose of prejudgment interest is to compensate the prevailing party fully for its loss. *Argonaut Ins. Co.*, 474 So.2d at 215. Where there is no dispute that TPS had contemporaneous notice of the fire, and where TPS has been adjudged to have breached its contractual obligation to indemnify SBA for losses incurred in dismantling and replacing the Tower, we think that interest should accrue from the date or dates of those losses. *See id.* ("[W]hen a verdict liquidates damages on a plaintiff's out-of-pocket, pecuniary losses, plaintiff is entitled, as a matter of law, to prejudgment interest at the statutory rate from the date of that loss."). That calculation will be for the District Court on remand.

contract claim, and will affirm its award of damages, attorneys' fees, and costs. We will reverse, however, the Court's award of prejudgment interest, and will remand with instructions to award prejudgment interest only from the dates of SBA's out-of-pocket losses. We will also order the reinstatement of TPS's crossclaims for indemnification and contribution.